69 U.S. 609 (1864)
2 Wall. 609
MINNESOTA COMPANY
v.
ST. PAUL COMPANY.
Supreme Court of United States.

*624 Messrs. Cary and Carlisle, for the appellee.
Mr. Carpenter, contra.
*631 Mr. Justice MILLER delivered the opinion of the court.
The first question raised by the demurrer relates to jurisdiction.
*632 For the purposes of this question we are to take the facts set up by the bill [his Honor had stated the main ones] and demurred to, as true, and consider whether they make a case for the jurisdiction of the Circuit Court of the District of Wisconsin, which has become successor of the District Court in that district.
The present suit grows immediately out of and is a necessity which arises from the suit, by Bronson, Soutter, and Knapp, to foreclose the Land Grant mortgage; under the decree in which suit the Western Division of the La Crosse and Milwaukie Road was sold, and also all the rolling stock of the company belonging to both divisions, to the Milwaukie and St. Paul Railway Company. The present suit is really a continuation of that one. The rights of the parties depend upon the construction which is placed upon the acts of the court in it; and the present bill is necessary in order to have a declaration of what was intended by the orders and decrees made in that suit, and to enforce the rights which were established by it.
The road and rolling stock, which are the subject-matter of this controversy, were placed in the hands of a receiver in the progress of that suit; and he was in possession of the rolling stock when, by an order of the District Court, made June 12, 1863, in that suit, and a similar order of the same date, in another suit, it was all delivered to the Milwaukie and St. Paul Railway Company.
At the last term of this court,[*] we decided that, by the act creating the Circuit Court for the District of Wisconsin, the District Court lost its power to make such orders, and that they were void. The consequence of this ruling is, that in contemplation of law, this property is still in the hands of the receiver of the court. If in the hands of the receiver of the Circuit Court, nothing can be plainer than that any litigation for its possession must take place in that court, without regard to the citizenship of the parties.[] If it has been taken illegally from the custody of the receiver, it is *633 equally clear that the court has not lost thereby the jurisdiction over the property, or the right to determine where it shall go; so far as that right is involved in that suit. This is the very object of this bill, and it is rendered all the more necessary by that which the court has done, as well as that which it has failed to do. In the case of Randall v. Howard,[*] these principles are fully stated as applicable to a proceeding in a State court, and are given as reasons why the Federal court would not interfere; although the parties had the right, so far as citizenship could give it, to litigate in the courts of the United States.
It is objected that the present bill is called a supplemental bill, and is brought by a defendant in the original suit, which is said to be a violation of the rules of equity pleading; and that the subject-matter, and the new parties made by the bill, are not such as can properly be brought before the court by that class of bills.
But we think that the question is not whether the proceeding is supplemental and ancillary or is independent and original, in the sense of the rules of equity pleading; but whether it is supplemental and ancillary or is to be considered entirely new and original, in the sense which this court has sanctioned with reference to the line which divides the jurisdiction of the Federal courts from that of the State courts. No one, for instance, would hesitate to say that, according to the English chancery practice, a bill to enjoin a judgment at law, is an original bill in the chancery sense of the word. Yet this court has decided many times, that when a bill is filed in the Circuit Court, to enjoin a judgment of that court, it is not to be considered as an original bill, but as a continuation of the proceeding at law; so much so, that the court will proceed in the injunction suit without actual service of subpna on the defendant, and though he be a citizen of another State, if he were a party to the judgment at law. The case before us is analogous. An unjust advantage has been obtained by one party over another by *634 a perversion and abuse of the orders of the court, and the party injured comes now to the same court to have this abuse corrected, and to carry into effect the real intention and decree of the court, and that while the property which is the subject of contest is still within the control of the court and subject to its order.
It is objected that Pratt and White and the Milwaukie and St. Paul Railway Company were not parties to that suit, and cannot therefore be compelled to yield their right to litigate with a citizen of Wisconsin in the courts of that State.
Pratt and White are mere nominal parties, who were the agents and attorneys of the corporators composing the Milwaukie and St. Paul Railway Company, and purchased the property at the marshal's sale for them. They and the company may both be considered as purchasers at that sale; and it is in their character of purchasers, and on account of the possession which they obtained on petition of the company, and the rights they claim under that purchase, that they are now brought before the court. If the court has jurisdiction of the matters growing out of that sale, and order of possession, as we have already shown that it has, then it has jurisdiction to that extent of these parties without regard to their citizenship. It would, indeed, be very strange if these parties can come into court by a petition, and get possession of that which was the subject of litigation, and then when the wrong they have done by that proceeding is to be corrected, they shall be permitted to escape by denying that they were parties to the suit. In the case of Blossom v. The Milwaukie and Chicago Railroad Company,[*] this matter was fully discussed, and it was there held, that a purchaser or bidder at a master's sale, subjected himself quoad hoc to the jurisdiction of the court, and became so far a party to the suit by the mere act of making a bid, that he could appeal from any subsequent order of the court affecting his interest.[]
*635 The objection to the jurisdiction must therefore be OVERRULED.
We next proceed to inquire whether the bill makes a case calling for relief.
This involves the consideration of the mortgage of complainants in the original suit, and of several orders and decrees of the District Court, all of which are the subject of conflicting constructions by the parties and their counsel.
In reference to the roadbed which is covered by these various mortgages, there is no diversity of opinion; but in reference to the rolling stock, it is contended by appellees that these several mortgages were successive liens on all the rolling stock of the company, and by appellant that they are liens only on the rolling stock belonging to, or in some way identified with, that part of the road included in each mortgage respectively. At first blush it would seem that in a road used continuously as one road, there could be no such definite relation between any particular division of the road and any particular portion of the stock. But as it was competent for the company which owned all the road and all the stock to assign certain stock to one division, and certain other stock to the other division, when the roads were divided for the purpose of making mortgages, we cannot assume as a fact that there was no such allotment of the rolling stock; but must look to the language of the mortgages themselves, to see if any such intention is expressed. If it is not, then obviously the other view prevails, and the mortgages are successive liens on the whole stock.
The language in the descriptive part of the Palmer mortgage, and that in the corresponding part of the mortgage on the Western Division, when considered in reference to the rolling stock alone, may not be free from doubt as to its construction.[*] But when we consider it in reference to the clear purpose of the parties to make the mortgages distinct, and different as to everything else conveyed by them, we conclude *636 that it was intended that the rolling stock covered by each mortgage was that which was properly appurtenant to each particular division of the road.
It is not so important that we be right in this, however, as we are satisfied that the District Court in the foreclosure suit decided this question; and as that decision is in full force and unreversed, it must conclude the parties to the present suit, all of whom claim under the decree of the court.
The complainants in the original foreclosure suit made defendants of all the judgment creditors of the company who had liens subsequent to themselves, and made the Milwaukie and Minnesota Company defendant, who held under the subsequent mortgage to Barnes, with a view to cut off their equity of redemption; but they did not make defendants of Bronson and Soutter, who held a subsequent mortgage on the Eastern Division, and a subsequent lien on the rolling stock, which complainants would also desire to extinguish, if they had believed it covered the same rolling stock which theirs did. By omitting these mortgagees they show their own construction that their mortgage, and that of Bronson and Soutter, did not cover the same stock; which could only be because it was appurtenant to the Eastern Division.
About the time that foreclosure suit was commenced, a suit was instituted in the same court to foreclose the second or Bronson and Soutter mortgage on the Eastern Division; but the holders of the Palmer mortgage were not made defendants to either suit. The two suits progressed pari passu to a final decree; but while the Western Division went to sale, an appeal stayed proceedings in the Eastern Division case, and no sale has yet been made under that decree. Very shortly after these suits were commenced, the court made an order of reference in each of them to masters in chancery, who were the same masters in both cases. These references were for the purpose of ascertaining the amounts due on the bonds, the amounts due certain judgment creditors, and the amount of rolling stock on the whole road, and the amount included in each mortgage. The language of *637 the order of reference on this latter point in the original suit in this case is as follows:
"And it is further ordered that said masters ascertain and report the whole amount of rolling stock on the road, and that they specify the quantity thereof that is covered by this mortgage, also in the first and second mortgages respectively."
The reference in the other case is in language almost identical.
Now it is argued that the object of this order was to ascertain and settle the priorities between these different mortgages. No such inference can be made from its language, for it says nothing about priorities in date, or superiority of lien. There was no occasion or reason for ascertaining those priorities in that suit, for the respective parties were not before the court, and could not be bound by its decree. It would not even bind complainants, because there would be no mutuality in the estoppel. It is an impeachment of the legal attainments of the court and of the counsel to suppose that they would make a reference to a master to ascertain a fact which could have no influence on the suit, and if passed upon by the court, could affect nobody's interest in the slightest degree.
But the language of the order clearly implies a different thing. The object is to ascertain, what is covered by one mortgage to the exclusion of the other; an object which had manifest pertinency to the duty which the court was called upon to discharge. The judge who made these orders delivered an opinion at the trial, in which he decides that the rolling stock of a railroad is a fixture; and if we suppose him to have considered that which was mortgaged to Palmer and to Bronson and Soutter as a fixture on the Eastern Division, and that which was mortgaged to Bronson, Soutter, and Knapp, as a fixture on the Western Division, we have a clear idea of what he wished to ascertain, in view of the decrees he was to make in the two suits.
We have next the report of the masters on this subject, which is as follows:
*638 "We have also ascertained the whole amount of rolling stock on the whole road at the cost price. The amount thereof was, at the date of the filing of the bill of complaint in this cause. $569,635.78, and an additional amount of $53,600 has been purchased since the filing of the bill of complaint, making the whole amount $623,235.78.
"And we have ascertained, and do further report, that of the said rolling stock, forty box cars, amounting, at the cost price thereof, to thirty-one thousand nine hundred and seventy-nine dollars and sixty-four cents, and numbered 330, &c. [giving the numbers], are covered by and included in the mortgage executed to the complainants as set forth in the bill of complaint in this cause, the said cars having been purchased, and by the proceeds of a portion of the bonds to which this mortgage is collateral; and all the remainder of the said rolling stock is covered by and included in the first mortgage upon the said railroad, and in the mortgage upon the said railroad executed to G.C. Bronson and J.T. Soutter, and bearing date on the seventeenth day of August, A.D. 1857."
In the foreclosure suit of the Eastern Division, these same masters reported on the same day:
"We have ascertained and do further report, that of said rolling stock, forty box cars, amounting, at cost price thereof, to $31,979.64, and numbered 330, &c., are covered by and included in the mortgage of Bronson, Soutter, and Knapp, and no other;"
and then adds, that the remaining rolling stock is covered by the mortgage to Palmer, and to Bronson and Soutter; that is, the mortgage on the Eastern Division.
It is impossible in examining these reports to doubt that the commissioners understood that they were directed to ascertain what rolling stock was covered by each mortgage, in order that only such might be sold under the decree in that case, and that they reported that of all the rolling stock on the road, forty box cars alone were subject to the mortgage in the present case, and that all the other stock was subject to the mortgage in the other suit. At all events, *639 they were directed to ascertain what was subject to the mortgage in this suit, and they reported the forty box cars, and did not report any more. This much is beyond dispute from the language of the report in this case.
Counsel for complainant excepted to this report. His fourth exception is that instead of certifying as they did, the masters should have reported,
"That all the rolling stock on said road was covered by and included in the mortgage given to said complainants, and described in their bill of complaint in this cause, and that said mortgage was a first and prior lien on said rolling stock superior to all other liens."
This exception was overruled by the court, and the report of the masters confirmed so far as this branch of the subject is concerned.
We regard this as a judicial decision, that complainant's mortgage did not cover the rolling stock which was covered by the previous mortgage to Palmer, and that it only covered the forty box cars, and such proportion of the rolling stock purchased by the receiver as the net earnings of the Western Division bears to the net earnings of the Eastern Division. This order modifying and confirming the report of the masters settled the rights of the parties, and by that decision, they must stand until it is reversed on appeal, or set aside by some direct proceeding for that purpose.
The final decree ordering the sale proceeds upon the same view of the rights of the parties. After ordering a sale of the property mortgaged, and copying the language given in the mortgage as descriptive of what was mortgaged, the decree adds:
"With forty box cars, &c., and such portion or share of the rolling stock purchased and procured by the receiver, costing $147,942.63, as the net revenues of the portion of the road covered by this mortgage bears to the balance or other end of the road, since the appointment of the receiver. The remaining rolling stock is subject to a prior mortgage." *640 That is to say, having decided that what is covered by the other two mortgages is not covered by this; it is not subject to sale in this suit.
The marshal, however, who was directed to make the sale instead of a master commissioner, did sell all the rolling stock, and that sale was confirmed by the order of the District Court of May 5, 1863.
It is too clear for argument, that a sale by the marshal, unauthorized by the decree, is without any validity. Does the order of the court confirming the sale make it valid?
Upon principle the question is by no means free from difficulty. We are clear that a sale without a decree to sustain it would be a nullity, and we doubt if a court can make it valid by a mere general order of confirmation. If, however, an issue had been made by exceptions or other proper pleading, as to the question whether any particular piece of property had been included in the decree, or order of sale, and the court had decided that it was so included, it might be an adjudication upon the construction of the decree which would bind the parties. Nothing of the kind occurred here. There is every reason, on the contrary, to believe, that the court had no suspicion that the marshal had sold more than the decree authorized.
On the 7th day of May, two days after the order of confirmation, the Milwaukie and St. Paul Railway Company, presented their petition for the discharge of the receiver, and for possession of the property which they had purchased. The court thereupon made an order "that the receiver deliver over to said Milwaukie and St. Paul Railway Company, the said road and appurtenances between Portage City and La Crosse, and the rolling stock and property specially described in the decree." The only rolling stock specially described in the decree was the forty box cars, and the proportion of stock purchased by the receiver. The fact that this was ordered to be delivered to the purchasers and no more, is almost conclusive of two things: first, that the judge understood his decree and previous rulings as we have interpreted them: and, second, that he had no idea that he had confirmed *641 a sale of all the rolling stock on the road, to the purchasers at the sale. It is true that over a month later, he ordered the Eastern Division of the road and the remainder of the rolling stock into the possession of the same company. But this was done to enable them to run the whole road as a through route, on the principle of public policy, and that it was better for all parties concerned. This he declared in an opinion delivered at the time, and it is substantially indicated in the orders themselves.
In the light of these facts, we cannot give to the order of confirmation in this case the effect of making valid the marshal's sale, however the rule might be on that subject in other cases. But we do not mean to intimate that in any case a sale by a marshal, or master in chancery, can be valid, when there is no decree to support it. Cases in this court[*] would seem to decide that it cannot.
The order of June 12, 1863, delivering possession of this property to the Milwaukie and St. Paul Railway Company, has been declared by this court to be void for want of jurisdiction, and has been set aside by the court which made it. It therefore affords no support to defendants in this claim to the rolling stock in dispute.
We have thus examined with care and patience the mortgage, and the various orders and decrees of the District Court, on which the claim of the Milwaukie and St. Paul Railway Company to the ownership of this property depends. There is in all of them some want of clearness and precision, including the mortgage itself. Before the court ordered the sale, it should have made clear all these ambiguities. It evidently attempted to do so, and we think if it has not in all cases effected that purpose fully, it has furnished the criteria by which it can be done. And although the language of its orders is not always free from doubt, we have been able to satisfy ourselves of the court's intentions.
The title of appellant is clear on the record, unless it has *642 been divested by these proceedings. We think that they do not confer title to the rolling stock on the Milwaukie and St. Paul Railway Company, nor divest the appellant, except as to the forty box cars, and the proportion of the stock purchased by the receiver, which the net earnings of the Western Division bore to the net earnings of the Eastern Division, and that they also decide that the mortgage under which they claim, did not include any more.
ORDER OF THE CIRCUIT COURT sustaining the demurrer to complainants' bill, and the decree of the court dismissing it, REVERSED, and the case remanded to that court for further proceedings not inconsistent with this opinion.
Mr. Justice NELSON, in whose opinion concurred CLIFFORD and FIELD, JJ., dissenting.
The complainants in this bill, who set up a right to the equity of redemption in the Bronson and Soutter mortgage, insist that the whole of the rolling stock on the old La Crosse and Milwaukie Road, with a trifling exception, is subject to the lien of this mortgage on the Eastern Division, the foreclosure of which is pending; and that a proper allowance of rent for the use of it on the Western Division should be made, and the avails applied to the interest due on the mortgage; and further, that the question involved was litigated and so decided in the foreclosure suit on the mortgage of the Western Division.
We have looked into the position of the counsel for the complainants, and have come to the conclusion that it is not maintained.
For aught that appears, all the rolling stock of the old company was purchased by it for the use and benefit of the whole of the road, out of the common funds of the company, and a lien was given upon it in each and all of the mortgages of that company on the two divisions, the Eastern and Western, and also upon it in the mortgage of the whole road to the complainants. These liens would take effect as matters of law according to priority. Any other disposition *643 of them would be unjust and in violation of good faith to the bondholders, for the security of the payment of whose bonds the mortgages were given.
The District Court, however, seems to have entertained the idea, that any of the rolling stock purchased by the proceeds of the bonds of a particular mortgage should be exclusively subject to the lien of that mortgage, and made a reference for this purpose; and on the coming in of the report, acting upon this idea, decided that some forty box cars purchased by the proceeds of the bonds of the first mortgage on the Western Division, should be sold and the proceeds applied exclusively to this mortgage, and that all the rest of the rolling stock on the road (meaning the whole road), when the receiver was appointed, was covered by the first mortgage of the road from Milwaukie to Portage (meaning the Palmer mortgage), and all purchased since the appointment of the receiver be applied to this first mortgage, and the mortgage in the bill of foreclosure, in the proportion therein mentioned.
The decree of foreclosure, after describing the property to be sold, and particularly the forty box cars and the share of the stock purchased since the appointment of the receiver, adds, "The remaining rolling stock is subject to prior mortgages."
In the report of the sale by the marshal, he states, that he sold of the rolling stock the forty box cars, and the share of the stock purchased since the receiver was appointed, free and clear of all incumbrances; but the remainder of the rolling stock was sold, subject to the lien of mortgages prior in date to the mortgage under which the sale was made. This report of the sale by the marshal was excepted to, but after argument the exceptions were overruled, and the sale confirmed, and although the complainants here were party defendants in that suit of foreclosure, no appeal was taken from the decree of confirmation.[*]
We are of opinion, therefore, that the question as to the *644 ownership or the liens upon the rolling stock in question were not adjudicated by the court below in the foreclosure suit on the mortgage upon the Western Division, and that the question is open for this court to determine.
We agree that the rolling stock upon this road covered by the several mortgages, and as respects any other valid liens upon the same, is inseparably connected with the road; in other words, is in technical language a fixture to the road, so far as in its nature and use it can be called a fixture. But it is a fixture extending over the entire track of the road from Milwaukie to La Crosse. It is not a fixture upon any particular division or portion; but attaches to every part and portion. It was purchased, as we have before said, for aught that appears, by the common funds of the old La Crosse and Milwaukie Company, and which were derived from its various resources,  subscriptions of stock, sale of bonds secured by mortgages, earnings of the road after a part or the whole line was fitted for the running of the cars; and the mortgages or other incumbrances on the road made by the old company, whether on a portion or on the whole line, take effect according to the priority of lien. These liens, so far as respects the rolling or moving stock, attach to them a right to have the cars run upon the road, upon its entire line, as the value of the lien depends upon this use of the property. The lien was acquired in contemplation of this use, for without it a mortgagee or lienholder of the commonest observation must have seen the security would be next to worthless. The great value of the road and rolling stock, as a security, consists in the use and operation of the same as a railroad line in the carriage of passengers and freight; it is the combined use maintained and enforced that enables the lien creditor to realize the security contemplated when the credit was given.
Our conclusion, therefore, is, that the mortgagees of the Eastern line have by virtue of the liens of their mortgages such an interest in the rolling stock, as to entitle them to the appropriate use of it in running the road for the carriage of passengers and freight; and that the Milwaukie and St. *645 Paul Company, by reason of their title under the mortgage foreclosed on the Western Division, acquired the same right; and also, that the complainants by virtue of their title under the mortgage foreclosed, acquired a similar right, and that neither has acquired an exclusive right or title to any portion of the rolling stock. We say nothing as to the persons or parties who may be entitled to liens on their property, as these questions are not before us; nor the evidence that would enable us to determine the same, nor could they be determined under this bill. Our conclusion is that the decree below should be affirmed.

NOTE BY THE REPORTER.
IT will be seen in the foregoing report that one of the questions decided in the inferior court was, that rolling stock is a fixture. The question was argued in this court with ability on both sides. But though the decision here is not inconsistent with that idea, but on the contrary, as the reporter supposes, rather affirmative of it, the point was apparently one not necessary to be specifically passed upon, and is not discussed in the opinion. The matter is, however, one of such practical and increasing importance that the reporter supposes he will gratify the profession by giving in this collateral way an extract from the brief of the appellant's counsel, Mr. Carpenter, who endeavored to support the modern view.

IS ROLLING STOCK A FIXTURE?
The term fixture was early seized upon by legal writers to supply a deficiency in their technical terminology; but was not entirely reclaimed from its popular use and fixed in that strictness and uniformity of meaning requisite to scientific certainty; and as used by legal writers, it has, continually fluctuated between a technical and a popular use. We have, therefore, many kinds of fixtures; and many exceptions and qualifications to each kind. A fixture is one thing between landlord and tenant; a different thing between vendor and vendee; is one thing in the economy of trade; another for the purposes of agriculture. Originally, the term denoted those movable things which had become immovable by connection with the *646 freehold. But presently it came to mean those things, which although attached to the freehold, could, under certain circumstances, be removed. In its popular use it meant something affixed or fastened to the freehold; and in the early cases, and many of the later ones, we find the popular definition of the term sweeping everything before it. An article was held to be a fixture or not, from the presence or absence of a screw fastening it to the floor.
By the great majority of cases, ancient and modern, there is no doubt that a fastening was essential to constitute the thing in question a part of the freehold; and nothing kept in place by mere gravitation was held to be a fixture. It is not less true that from the first we have the doctrine of constructive annexation equally well established. In Liford's Case,[*] it is said to have been decided in the fourteenth year of Henry VIII, that a millstone, removed from a mill to be picked, was nevertheless constructively a part of the freehold, and passed by deed conveying the mill. In England, title deeds have been held to be fixtures; and deer in a park, and fish in a pond, to pass with the estate.
The right to remove articles as fixtures has been carried farther in favor of tenants and to encourage trade than in any other cases; yet this right has been somewhat limited; and it has been held that where an engine, in no way attached to the freehold, could not be removed without injury to the building in which it was set up, that the tenant could not remove it. There are cases in England of more recent date, still farther tending to put this subject upon a reasonable, as distinguished from a philological ground; and to hold that a thing is to be regarded as real or personal property, according to its relation to, and connection in use with, the freehold, rather than from the manner in which that connection may be accomplished. And it has been expressly decided that actual fastening is not necessary to make a thing part of the estate.
In the United States we have three different rules established by different States.
1. The thing must be so fastened to the estate that its removal would seriously injure the freehold, beyond the loss of the thing removed.
2. If the chattel is essential to the use of the real estate, and actually, though slightly attached, it will pass with the freehold.
3. If the thing be essential to the use of the real estate, and has uniformly been used with it, then it passes, though not fastened to it.
As an original proposition, the third rule seems the most satisfactory Take for instance a manufacturing establishment. The building is constructed to receive the various machines necessary for carding wool, spinning yarn, weaving and dressing cloth, and this business is carried on in the building. One machine is so light, or its motion so violent, that it must be steadied by some fastening to the floor; the next is heavy enough to keep in place by its own weight. Now there is no reason in saying that one machine will, and the other will not, pass with the freehold. Both are essential to *647 the same business, one is useless without the other, and both are in the mind of the purchaser when he buys the establishment. It seems absurd to say that, to be sure of getting all the machinery, he must nail it down to the floor, when perhaps fifty men could not start it a hair. The purpose for which the thing was constructed, and the manner in which it was enjoyed in connection with the freehold, should determine whether it is real or personal estate
Following this view, it was held, in Farrar v. Stackpole,[*] that where machinery was essential to the purposes for which the building in which it was used was erected, that this fact alone constituted it real estate, whether it was nailed down or whether only held down by the laws of gravitation.
Other cases[] are to the same effect; although a far greater number of cases could be cited to the contrary, both from England and American reports.
In Walker v. Sherman,[] actual fastening was held essential; but in a more recent case, Snedeker et al. v. Warring,[§] this distinction is overruled, and the law of fixtures put upon sensible ground and according to the doctrine in the above cases. In the latter case, a statue and sun-dial were held part of the real estate. The court say, "If the statue had been actually affixed to the base, by cement or clamps, or in any other manner, it would be conceded to be a fixture and to belong to the realty. But as it was, it could have been removed without fracture to the base on which it rested. But is that circumstance controlling? A building of wood, weighing even less than this statue, but resting on a substantial foundation of masonry, would have belonged to the realty. A thing may be as firmly affixed to the land by gravitation as by clamps or cement. Its character may depend much upon the object of its erection. Its destination, the intention of the person making the erection, often exercises a controlling influence; and its connection with the land is looked at principally for the purpose of ascertaining whether that intent was that the thing in question should retain its original chattel character, or whether it was designed to make it a permanent accession to the lands."
We come now to give this law of fixtures an application to the present subject-matter.
Suppose a corporation created by law to build, equip, and work a railroad, and for no other purpose. It mortgages its roadbed, between certain limits, all its depots and station buildings, its right of way, and all appurtenances between those limits; and all the franchises, privileges, and rights of the company of, in and to, or concerning the same. The road is useless without the rolling stock. Here is a case then falling fully within the principle of earlier cases;[] the real estate worthless without the rolling stock, *648 which has been used only upon the road; and the rolling stock, so essential to the use of the road, utterly worthless for any other or different use. We have already seen the senseless fiction of fastening done away with; and we have but to apply the principles of the cases cited, and we shall come to the result that the rolling stock is in the nature of a fixture; and as such must be conveyed by the mortgage conveying the estate. It has not, indeed, exactly the same connection with the realty that the statue had in Snedeker v. Warring; it is not held or kept in one place by fastenings, or by its weight. But this circumstance is of no consequence if the principle deducible from the cases above cited is to govern. If a billiard table were fastened to the floor so as to be conceded a fixture, would not the balls and cues pass also? A bucket in a well may be detached, and it is movable, running from top to bottom of the well, yet it is a fixture by common consent. A shuttle in a loom is thrown from place to place by the motive power of the machinery, yet it is an essential part of the machine. It is not inconceivable that rails and cars might be so constructed as that the car should be held upon the rail by certain material contrivances, and yet be propelled from one station to another; from one end of the road to another, by steam power. In such a case none would doubt that the cars were a fixture. Can it be said that the manner of accommodating and adjusting the cars to the rails can make any difference? "The railroad, like a complicated machine, consists of a great number of parts, a combined action of which is essential to produce revenue. And as well might a creditor claim the right to levy on and abstract some essential part from Woodworth's planing machine, or any other combination of machinery, as to take from a railroad its locomotive and passenger cars. Such an obstruction would cause the operations to cease in both cases."[*]
Then, again, following the principle of Snedeker v. Warring, the destination of the rolling stock, the intention of a company to pass it, will have an influence in determining whether such stock is real or personal property. This consideration would be as conclusive in regard to the furniture of a railroad as it was in regard to the statue, where it was presented: and even more so. The statue might have been sold by the sculptor for the adorning of any residence; though in fact it was made for the particular use. The right to buy and own rolling stock is a franchise, and can only be exercised as an accessory to the operation of a railroad. Any buying or selling of cars, engines, &c., by the company, for the mere purpose of speculation, would be unauthorized and illegal. Here, then, is a consideration showing that a company intends the rolling stock to be used only for the road, or, in other words, to become a permanent accession to the real estate of the company. The intention of the owner, the use for which the property was designed, the connection between the road and the cars, and the essential relation between them, for the purposes of revenue, all combine to declare the rolling stock real estate.
In Pierce v. Emery,[] the Portsmouth and Concord Railroad Company had *649 mortgaged all their property, real and personal, and all their franchises. The court held that the rolling stock acquired subsequently to the execution of the mortgage belonged to the mortgagee. The court say, "The object of the act being to give the bondholders a substantial and available security for their money, and a preference over other creditors not previously secured, can only be answered by so construing the law authorizing the mortgage as to give the bondholders security upon the road itself, as the general subject-matter of the mortgage, and upon the changing and shifting property of the road as part and parcel, by accession, of the thing mortgaged."
In Phillips v. Winslow, in Kentucky, it was held that, in equity, the rolling stock acquired subsequent to the execution of the mortgage, passed as an accession or fixture.
In Redfield on Railways,[*] it is said, indeed, that rolling stock is an accessory, though not a fixture. The distinction is, perhaps, one of words. In the strict technical sense of the word, as used in the old cases, rolling stock is not a fixture; but within the reason and philosophy of the modern cases it would seem to be so. If it must not be called a fixture, in deference to the old cases, it is yet an accessory of that sort, which has every element of one; and to be regarded accordingly, however named.
The conclusion is, that rolling stock, put and used upon a railroad, passes with a conveyance of the road, even without mention or specific description.
NOTES
[*] Bronson v. La Crosse Railroad Company, 1 Wallace, 405.
[] Freeman v. Howe, 24 Howard, 460.
[*] 2 Black, 585
[*] 1 Wallace, 635.
[] De la Plaine v. Lawrence, 10 Paige, 602; Calvert on Parties to Suits it Equity, pages 51, 58, and note to page 61.
[*] See them con-columned, at page 611; the former in the right column, the latter in the left.  REP.
[*] Shriver v. Lynn, 2 Howard, 43; Brignardello v. Gray, 1 Wallace, 627.
[*] Blossom v. Milwaukie, &c., R.R. Co., 1 Wallace, 655-7.
[*] 11 Reports, 50, b.
[*] 6 Greenleaf, 157.
[] Lawton v. Salmon, 1 Henry Blackstone, 259; Fairis v. Walker, 1 Bailey, 541 (S. C); Voorhis v. Freeman, 2 Watts & Sergeant, 116; Pyle v. Pennock Id. 390: Goodrich v. Jones, 2 Hill, 142.
[] 20 Wendell, 636.
[§] 2 Kernan, 170.
[] Farrar v. Stackpole; Voorhis v. Freeman; and Pyle v. Pennock
[*] McLean, J., in Coe v. Pennock et als
[] 32 New Hampshire, 484.
[*] Page 576, note.